**UNITED STATES BANKRUPTY COURT
DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In Re:<br>Pro-Mark Services, Inc.<br>　　　　Debtor | Court File No.: 24-30167<br><br>Chapter 7 Case |

**HARTFORD'S OBJECTION TO THE UNITED STATES AIR FORCE'S MOTION
TO APPROVE JOINT SETTLEMENT BETWEEN
THE UNITED STATES AIR FORCE AND THE TRUSTEE [D.E. 157]**

Hartford Accident and Casualty Company ("Hartford") by and through its undersigned counsel, The Hustead Law Firm, *A Professional Corporation*, hereby objects to the Motion to Approve Joint Settlement between the United States Air Force ("Air Force") and the Chapter 7 Bankruptcy Trustee, Erik A. Ahlgren ("Trustee").

### I.　　INTRODUCTION

1.　　From November 8, 2020, to September 28, 2022, in connection with Pro-Mark Services, Inc. ("Pro-Mark or "Debtor"), Hartford executed construction surety bonds on behalf of the Debtor and for the Benefit of the Air Force. ("Air Force Bonds"). The Air Force Bonds carry a combined total penal sum of $16,716,186.00. The Air Force Bonds are incorporated by reference herein, and attached as **Exhibit A**.

2.　　As required by prevailing federal law, the Air Force Bonds guaranteed the Debtor's work on a variety of construction related activities at Air Force bases in Colorado, Nebraska, and North Dakota. Specifically, the work was performed, and certain work remains to be performed, at Buckley Air Force Base (Colorado), Grand Forks Air Force Base (North

1

Dakota), Minot Air Force Base (North Dakota), and Offutt Air Force Base (Nebraska). The United States Air Force was the named Obligee on each of the Air Force Bonds.

3. Relevant here, the contracts between the Air Force and the Debtor which were bonded by Hartford included FA2543-22-F-0058 (Buckley AFB), FA4659-22-F0059 (Grand Forks AFB), FA4528-21-F-0091 (Minot AFB), FA4528-20-D-004 (Minot AFB), and FA4600-20-F-0192 (Offutt AFB) (together, the "Contracts").

4. As consideration for, and in connection with, the execution of the Air Force Bonds and other Bonds, the Debtor and the non-debtor individual owners of the Debtor's business (collectively, the "Indemnitors") executed and delivered a General Indemnity Agreement dated July 14, 2020, (the "GIA"), in favor of Hartford. A copy of the GIA is attached hereto as **Exhibit B** and incorporated by reference herein. *See also* Affidavit of Brian Bragg, attached hereto as Exhibit C, at ¶ 5.

5. The GIA executed by the Debtor and Indemnitors in favor of Hartford provides, in relevant part at ¶ 9:

> **Assignment.** [A]ll Indemnitors irrevocably assign, transfer, and convey the following to Hartford;
>
> (a) All rights of the indemnitors in, arising from, or related to Bonds or any or unbonded contracts, subcontracts and subcontract bonds and any extensions, modifications, alterations, or additions thereto; and
>
> (b) All right, title and interest of the Indemnitors in and to; (1) the work performed on any Bonded or unbonded contract; and (2) all supplies, tools, plant, machinery, inventory, equipment and materials; and (3) all materials purchased for or chargeable to any contract or Bond which may be in the process of manufacture, construction or transportation, or in storage anywhere; and (4) Books and Records, patent rights, copyrights, trademarks, and any and all bond claims or other affirmative claims; and (5) computers, computer systems, programs and licenses; and
>
> (c) All rights arising out of insurance policies which the indemnitor has an interest as a policyholder, beneficiary or otherwise; and

2

    (d) Any and all accounts receivable, accounts, chattel paper, documents of title, intangibles, claims, judgments, choses in action, purchase orders, bills of lading, federal or state tax refunds, tort claims, premiums, deferred payments, refunds, retainage or retainage account in which the Indemnitors have an interest.

6. On April 22, 2024, Pro-Mark filed a Chapter 7 petition for relief under the United States Bankruptcy Code in the U.S. Bankruptcy Court for the District of North Dakota. Ex. C, at ¶ 9.

7. On September 3, 2024, Hartford filed its Proof of Claim.

8. During September of 2024, Hartford contacted the Air Force to negotiate taking over and completing certain of the Debtor's incomplete projects for the Air Force. Ex. C, at ¶ 12.

9. The Air Force took the position that it was not permitted to enter into a takeover agreement(s) with Hartford without relief from the automatic stay. Hartford has followed up with the Air Force on multiple occasions as to whether the Air Force would seek relief from the automatic stay to allow completion of the Debtor's projects. Ex. C, at ¶ 12.

10. On November 5, 2024, the Air Force and Trustee filed the Motion to Approve a Joint Settlement Agreement to unilaterally terminate the Debtor's Air Force Contracts bonded by Hartford and to surrender remaining bonded contract funds, which has been assigned to Hartford and/or otherwise constitutes Hartford's collateral, to the Debtor's estate. *See* [D.E. 156 at ¶¶ 13, 17]; [D.E. 157].

11. The Air Force and Trustee have allegedly conducted a review of project information available to them and have negotiated payment of amounts allegedly owed to the Debtor's estate for any and all acceptable work that it performed under the Air Force Contracts prior to the Petition Date. *See* [D.E. 156 at ¶ 15].

3

12. The Air Force and Trustee assert that $587,707.49 is owed to the Debtor's estate for work performed under the Air Force Contracts. *Id.* at ¶ 17; Ex. C, at ¶ 14.

13. The Joint Settlement Agreement states that the Air Force reserves the right to pursue any and all pre-petition claims against the Debtor's estate through the filing of a proof of claim. *Id.* at ¶ 18.

14. The Joint Settlement Agreement further provides that, upon completion of payment of amounts owed to the Debtor, the Air Force will be released from any and all claims the Debtor may have relating to the Air Force Contracts other than those that may arise in connection with the Joint Settlement. *Id.* at ¶ 19.

15. The Joint Settlement Agreement additionally provides that, for the contracts where a payment and/or performance bond was required to be provided by the Debtor, the Air Force reserves the right to pursue completion through the surety bond. *Id.* at ¶ 20.

16. The Joint Settlement Agreement was negotiated and submitted without the knowledge or consent of Hartford, despite the prejudicial impact on Hartford's rights to the funds, collateral, and Hartford's obligations under the Bonds.

17. As it relates to the Bonds executed in favor of the Debtor for Air Force Contracts at Minot Air Force Base, Hartford has incurred and paid losses of $646,329.66, and Hartford is still exposed to unpaid claims totaling at least $213,736. Ex. C, at ¶ 10.

18. Hartford has further incurred and paid losses of $183,819 for Bonds executed in favor of the Debtor for Air Force Contracts at Offutt Air Force Base. Ex. C, at ¶ 11.

19. Hartford is exposed to potential additional claims for performance obligations. Ex. C, at ¶¶ 10, 15.

20. Prior to and following the Debtor's bankruptcy filing, Hartford received payment

4

and performance bond claims for the Debtor's federal construction projects, which claims exceed $10,000,000.00, which exposure largely remains for Hartford. Ex. C, at ¶ 15.

## II. LEGAL ARGUMENT

### A. A JOINT SETTLEMENT BETWEEN THE AIR FORCE AND BANKRUPTCY TRUSTEE IS NOT REASONABLE UNDER THE *FLIGHT TRANSPORTATION* AND *DREXEL* FACTORS

The proposed settlement negotiated by the Air Force and Chapter 7 Trustee is a transparent attempt to deprive Hartford of its bonded collateral (i.e. $587,707.49 in remaining bonded Contract funds), while at the same time seeking to terminate the Contracts and shift the cost to perform the Contracts solely on Hartford. Thus, the Joint Settlement is unreasonable as it deprives Hartford of the very rights and protections that Hartford relied upon in deciding to execute the Bonds on behalf of the Debtor and the Air Force in the first place.

A surety's legal and equitable rights to receive bonded contract funds have long been recognized and upheld by the United State Supreme Court. In *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962), the Court held that the surety of a government contractor, whose contract was terminated, was subrogated (i) to the government's rights to use retained funds to pay laborers and materialmen; (ii) to the rights which laborers and materialmen had to be paid; and (iii) to rights which the contractor would have had, had he completed the job, against the bankrupt contractor's trustee in bankruptcy). Accordingly, as the Joint Settlement is violative of longstanding, prevailing law, it also appears to be *per se* unreasonable.

To determine the reasonableness of a bankruptcy settlement, the Eight Circuit has applied the *Flight Transportation* or *Drexel* factors, which include "(a) [t]he probability of success in litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, convenience and delay necessarily

5

attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *In re Wigley*, 557 B.R. 678, 685 (B.A.P. 8th Cir. 2016) *citing Drexel Burnham Lampert Corp. v. Flight Transp. Corp.*, (*In re Flight Transp. Sec. Litigation*), 730 F.2d 1128 (8th Cir. 1984); *Drexel v. Loomis*, 35 F.2d 800 (8th Cir. 1929).

As to the probability of success if Hartford is forced to further litigate or appeal to protect its right to Contract funds, Hartford believe that courts will recognize and enforce its rights under longstanding law. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136 (1962); discussion *supra.* Additionally, a performance or payment bond surety who, like Hartford here, discharges its bond obligations may assert its subrogation rights and obtain priority to all of the bonded contract funds against any competing claim. *See National Surety Co. v. United States*, 319 F. Supp. 45, 48 (N.D. Ala. 1970) ("A surety called upon to answer for its principal's default is subrogated to any funds due or to become due under the contract and this subrogation right relates back to the date of the bond.")  Thus, to the extent additional litigation is necessary, and contrary to the Air Force's assertion that litigation would result in an unfavorable outcome for all parties involved, Hartford anticipates an outcome in its favor.

Second, the Air Force argues that the Joint Settlement is in the mutual interest of the parties but appears to wholly ignore Hartford's interest as a priority secured creditor with remaining bonded obligations. As set forth in the Affidavit of Brian Bragg (Exhibit C), Hartford has been assigned and/or will use bonded Contract funds to help offset Hartford's bonded losses associated with the Air Force projects, including performing remaining work under the Contracts.

If the Joint Settlement is approved, Hartford likely will be left without recourse to mitigate its bonded losses. Indeed, the Joint Settlement proposes that the Trustee would

6

administer the Debtor's earned Contract funds through the proof of claims process, without any explanation as to how the Trustee intends to treat Hartford's priority assignment rights and collateral interests in the bonded Contract funds.  *See* D.E. 156 at ¶ 20.  It defies prevailing law and underlying notions of equity if Hartford were forced to continue paying bonded obligations while being denied the right to offset its losses with earned Contract funds.  *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136 (1962); *see National Surety Co. v. United States*, 319 F. Supp. 45, 48 (N.D. Ala. 1970); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 952 (8th Cir. 2004) (when a surety completes work or pays laborers and material suppliers, equitable subrogation permits the surety to proceed against retainage and remaining contract funds for reimbursement).  Indeed, "[b]y settling with the general contractor [the Debtor/Trustee] and releasing payments and retainage before they are due or not due at all, the obligee [the Air Force] increases the surety's risk and impairs the surety's ability to be made whole through subrogation if the surety is later called upon to discharge the underlying obligation." *Id*.

Third, although Hartford believes it will prevail if future litigation is necessary to protect its interest in the Contract funds, Hartford tends to agree with the Air Force that such litigation would likely be costly, time-consuming, and inconvenient for the parties — but necessary should Hartford's objection to the Joint Settlement not be sustained.  Litigation would create a larger, but likely avoidable dispute, and as such, this issue should be resolved as part of negotiations between the Air Force and Hartford to address the use of earned contract funds, remaining contract funds, and completion of the Debtor's unfinished bonded projects.

Lastly, the paramount interest of Hartford, as the Debtor's creditor with priority rights to the Contract funds, is a predominant issue to be considered.  If the Joint Settlement is approved

7

and Hartford's collateral interests in the bonded Contract funds ignored, Hartford will be irreparably harmed. *See Wingsco Energy One v. Vanguard Groups Resources 1984, Inc.*, 1989 WL 223756 (S.D. Tex. 1989) (recognizing surety's right to be collateralized and finding that surety would suffer irreparable harm if denied its bargained-for collateral); *Escrow Agents Fidelity Corporation v. Superior Court*, 4 Cal. App. 4th 491 (1992) (same); *Doster v. Continental Casualty Co.*, 105 So.2d 83 (Ala. 1958) (same).

As a creditor, the amount of Hartford's claim against the Debtor's estate will commensurately increase for each dollar of bonded Contract funds that is not used to satisfy bonded obligations. Thus, the paramount interest, as in nearly every surety context, is that bonded contract funds be used to satisfy bonded liabilities. The terms of the Joint Settlement, however, make clear that the interests of Hartford were not considered when the Settlement was negotiated. An agreement is not reasonable if it is manifestly prejudicial to an interested party – here, Hartford. Since the factors weigh heavily in favor of Hartford, Hartford requests that the Court sustain Hartford's objection under the *Drexel* and *Flight Transportation* factors and decline to approve the proposed settlement.

**B. HARTFORD'S EQUITABLE SUBROGATION AND ASSIGNMENT RIGHTS ENTITLE HARTFORD TO REMAINING CONTRACT FUNDS TO BE USED TO PERFORM THE CONTRACTS AND OFFSET THE SURETY'S LOSSES.**

    **1.** <u>**A Surety's Equitable Subrogation Rights**</u>

The Joint Settlement between the Air Force and Trustee ignores Hartford's subrogation rights to the Debtor's earned, bonded Contract funds. Indeed, the Eighth Circuit recognizes a surety's subrogation rights. *See Pennsylvania Nat. Mut. Ca. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 951 (8th Cir. 2004) (citing *Prairie State Bank v. United States*, 164 U.S. 227 (1896). North Dakota state law is in full accord. *See State Farm Mut. Auto. Ins. Co. v. Wee*, 196 N.W.2d

8

54 (N.D. 1971).

The remedy of equitable subrogation thus allows a performing surety to step into the shoes of the benefited party. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136 (1962); *Nat'l Shawmut Bank v. New Amsterdam Ca. Co.*, 411 F.2d 843 (1st Cir. 1960); *see also Hartford Fire Ins. Co. v. U.S.*, 108 Fed. Cl. 525, 532 (Ct. Cl. 2012) (where a surety takes over contract performance, the surety succeeds to the contractual rights of both its principal and the project owner); *Travelers Cas. And Indem. Co. of Am. v. Paderta*, No. 10 C 406, 2013 WL 3388739 at *5 (N.D. Ill., Jul 8, 2013) (surety entitled to equitable subrogation regardless whether it completes the contract work or pays the obligee to close-out the contract.)

It is a bedrock principle of suretyship that upon making bond payments (which Hartford has), a surety is entitled to earned but unpaid contract funds. *See, e.g., Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962). Under *Pearlman* and its progeny, when, as here, a surety makes a bond payment, it is subrogated to the rights of the Owner (in this case, the Air Force) to use those funds to offset the losses on bonded projects. *See Am. Fid. Co. v. Nat'l Bank of Evansville*, 266 F.2d 910, 914 (D.C. Cir. 1959) ("This subrogation, sometimes called an 'equitable lien,' relates back to the date of the bond, and is therefore superior to any conflicting claim thereafter asserted by another").

*Shawmut* and the line of case that follow make clear that sureties' subrogation rights apply even against Parties like the Air Force, as owner/obligee. *Shawmut* explains:

> [T]he Surety in cases like this undertakes duties which entitles it to step into three sets of shoes. When on default of the contractor, it pays all the bills of the job to date and completes the job; it stands in the shoes of the contractor insofar as there are receivables do it [sic]; in the shoes of laborers and materialmen who have been paid by the surety — who may have had liens, and not least, in the shoes of the [Owner], for whom the job was completed.

*Id.* at 845.

9

*Shawmut* has repeatedly been upheld. *See, e.g., Safeco Ins. Co. v. Wheaton Bank and Trust Co.*, 2009 WL 2407740 at *2 (N.D. Ill. 2008); *Great Am. Ins. Co. v. U.S.*, 203 Ct. Cl. 592, 492 F.2d 821 (1974); *U.S. Fid. & Guar. Co. v. APAC-Kan., Inc.*, 151 F. Supp. 2d 1297 (D. Kan. 2001).

Further, Hartford's subrogation rights, although growing out of a contractual setting and often times articulated by the contract, do not depend on the contract as a grant of their existence, but are created by law. *See State Bank & Trust Co. v. Ins, Co., of the W.*, 132 F.3d 203, 206 (5th Cir. 1997). Therefore, these rights arise without the need for Hartford to file a UCC Financing Statement or take any further step to perfect its rights. *See In Standard Acc. Ins. Co. v. The Fed. Nat'l Bank*, 112 F.2d 692, 115 F.2d 34 (10th Cir. 1940); *Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 6 U.C.C. Rep. Serv. 441 (1st Cir. 1969); *In re J. v. Gleason Co.*, 452 F.2d 1219, 9 U.C.C. Rep. Serv. 1317 (8th Cir. 1971) *see also Home Indem. Co. v. U.S.*, 433 F.2d 764, 765 (Ct. Cl. 1970) ("Suffice it that we too believe that 'equitable subrogation is too hard a plant to be uprooted by a [Bankruptcy] Code which speaks around but not on to the issue."). These rights are superior to the rights of the bankruptcy estate because Hartford's rights as surety vest upon "full satisfaction for default and relate back to the time the bond or contract of suretyship was entered into." *City of Pine Bluff* at 952 (8th Cir. 2004); Restatement (Third) of Suretyship and Guaranty § 31(b).

Pursuant to the law above, and discussed in more detail below, by making bond payments, Hartford is subrogated to the rights of the Debtor, the Debtor's laborers and material suppliers (i.e. subcontractors), and the Air Force to the earned Contract funds. Hartford would likely be subrogated to the remaining contract balance as a performing surety. *Id.* Hartford has paid at least $830,148.66 to resolve claims on the Air Force payment bonds and remains exposed

10

to at least $213,736 in claims on the Air Force payment bonds and undetermined performance bond liabilities. *See Pearlman.*, 371 U.S. 132 (1962); *City of Pine Bluff*, 354 F.3d at 952 (8th Cir. 2004); *see also* Affidavit of Brian Bragg (Ex. C).

Thus, the Joint Settlement should not be approved as it ignores and denies Hartford's equitable subrogation rights to receive the earned Contract funds.

### a. The Surety's Subrogation Rights Include Pro-Mark's Rights to Use Contract Funds to Complete the Project.

When a principal has defaulted, the Surety may take over the defaulted bonded contracts and arrange for the physical completion of the work under the bonded contract. *Aetna Cas. & Sur. v. United States*, 845 F.2d 971, 975 (Fed. Cir. 1998) (The completing surety "may formally take over the project and contract for its completion."); *see also Trinity Universal Ins. Co. v. United States.*, 382 F.2d 317, 320 (5th Cir. 1967).

When the Debtor, as principal, defaulted on the construction projects, Hartford became entitled to utilize the Contract balance to complete the projects. *See Hartford Fire Ins. V. Henry Bros,* 2014 WL 4267487, at *3-4 (N.D. Ill. Aug. 28, 2014). Indeed, the Federal Acquisition Regulations recognize that "[s]ince the surety is liable for damages resulting from the contractor's default, the surety has certain rights and interests in the completion of the contract work and application of any undisbursed funds." FAR § 49.404(b). Hartford contacted the Air Force, informing them that Hartford was prepared to negotiate takeover agreements with the Air Force to complete remaining work on the Air Force Contracts.

The Air Force, however, has taken the position that it requires relief from the automatic stay under 11 U.S.C. § 362 to enter such agreements. Meanwhile, the Air Force and Trustee apparently negotiated the Joint Settlement, without any input from Hartford, and agreed amongst themselves how Contract funds will be utilized. This, they cannot do.

If the earned Contract funds are depleted by the Joint Settlement between the Air Force and the Trustee, Hartford will be prejudiced by the lost opportunity to use its bonded collateral to complete the bonded contract work and mitigate Hartford's damages. Through the settlement agreement, the parties are interfering with Hartford's rights to equitable subrogation as the performance surety. *See U.S. ex rel. WESCO Distribution, Inc. v. Greenleaf Constr. Co., Inc.*, No. 414CV00315RGECFB, 2018 WL 10262170, at *25 (S.D. Iowa Feb. 15, 2018) ("a performance bond surety can take over a project and complete performance obligations of the principal."); *see also Dunn & Black, P.S. v. United States*, 366 F. Supp. 2d 1008 (D. Wash. 2005) (holding that rights of subrogation apply equally when the surety is called upon to pay a labor or material claim as when the surety has elected to complete the performance of the contract).

Here, Hartford has already incurred losses of at least $830,147.66 satisfying payment claims on the Air Force Bonds and is prepared to comply with its bonded performance obligations for the Air Force Contracts totaling $16,716,186.00. Hartford's subrogation rights entitle it to receive the Debtor's earned Contract funds at issue in the Joint Settlement to offset the Surety's bonded losses.

2. **Hartford's Assignment Rights Granted by The Debtor under the GIA Give the Surety All Rights to Bonded Contracts.**

Bankruptcy Courts recognize that "[s]ureties are entitled to claim rights arising by operation of law and under the assignment clause of an indemnity agreement." *In re Jones Constr.*, 337 B.R. 579, 585 (Bankr. E.D. Va 2006) (Citing *Plant Process Equip., Inc. v. Cont'l Carbonic Prods.*, Inc. 1994 WL 201218 at *3, n.7 (N.D. Ill. 1994) (citing Armen Shahinian, The General Indemnity Agreement in THE LAW OF SURETYSHIP, (ABA Tort & Ins. Prac. Sec., Gallagher, E., ed. 1993)).

The *Jones* Court also observed "the fact that the assignment of rights at issue took place

12

pre-petition and not by some operation of bankruptcy law does not require a different result," noting that "pre-petition assignments are valid, and the [subject matter] of any assignment that vests rights in the assignee pre-petition are not property of the estate." *Jones Constr.*, 45 B.R. at 586 (citing *In re Prudoff*, 186 B.R. 65 (Bankr. E.D. Va. 1987; In re Duty, 78 B.R. 111 (Bankr. E.D. Va. 1987) ("the trustee could not avoid Johnson-Willis' interest . . . because Johnston-Willis is not asserting a lien on the proceeds, but rather an ownership interest through the assignment that vested prior to [the debtor's filing.").

The GIA was executed between Hartford and the Debtor as partial consideration, and to induce Hartford to issue the Bonds. The GIA executed by the Debtors in favor of Hartford contains an assignment provision, which reads in relevant part at ¶ 9:

> **Assignment.** [A]ll Indemnitors irrevocably assign, transfer, and convey the following to Hartford;
>
> (a) All rights of the indemnitors in, arising from, or related to Bonds or any or unbonded contracts, subcontracts and subcontract bonds and any extensions, modifications, alterations, or additions thereto; and
>
> (b) All right, title and interest of the Indemnitors in and to; (1) the work performed on any Bonded or unbonded contract; and (2) all supplies, tools, plant, machinery, inventory, equipment and materials; and (3) all materials purchased for or chargeable to any contract or Bond which may be in the process of manufacture, construction or transportation, or in storage anywhere; and (4) Books and Records, patent rights, copyrights, trademarks, and any and all bond claims or other affirmative claims; and (5) computers, computer systems, programs and licenses . . .

Additionally, pursuant to ¶ 11 of the GIA, the Trust Fund Provision provides that:

> 11. **Trust Fund.** If a Bond is Underwritten in connection with the performance of any contract, the entire contract price shall be dedicated to the satisfaction of the obligations of the Bond and this Agreement. All money paid or any securities, warrants, checks or evidences of debt given under contracts relating to or for which a Bond has been issued shall be impressed with a trust for the purpose of satisfying the obligations of the Bond Underwritten for said contract and this Agreement shall be used for no other purpose until all such obligations have been full satisfied.

13

Here, in the Joint Settlement Between the United States Air Force and the Trustee, the parties have identified $587,707.49 in contract funds "owed to the debtor's estate." *Joint Settlement Between The United States Air Force and the Trustee* at *4. Pursuant to ¶ 9 of the GIA, however, these funds are owed to Harford because the Debtor assigned to Hartford "All rights of the Indemnitors in, arising from, or related to Bonds or any bonded or unbonded contracts, subcontracts and subcontract bonds" and "All right, title and interest of the Indemnitors in and to; (1) the work performed on any Bonded or unbonded contract . . . ." GIA ¶ 9. This assignment was effective, "on the earlier date of the date of this agreement or the date on which Hartford first Underwrites a Bond on behalf of any Indemnitor. . . ." GIA ¶ 9.

Pursuant to ¶ 11 of the GIA, all funds from bonded contracts "shall be dedicated to the satisfaction of the obligations of the Bond and this Agreement." "Ultimately, when the parties enter a contract, they make their own law, and the duties between them are established by the contract." *Roen Land Trust v. Frederick*, 530 N.W.2d 355, 357 (N.D. 1995). When the language of a contract is unambiguous, and the intent is apparent from its face, there is no room for further interpretation." See Habeck v. Macdonald, 520 N.W.2d 808, 811 N.D. 1994).

Here, the GIA's applicable language provides that Hartford was assigned <u>all rights</u> of the Debtor <u>arising from</u> or <u>related to</u> the Bonds and bonded contracts. As such, the only reasonable interpretation is that Hartford was assigned the Debtor's rights in the Air Force Contracts. Thus, Hartford has a contractual right under the GIA to receive bonded Contract funds to partially fund and reimburse Hartford's payment and performance obligations under the Bonds, specifically including those under the Air Force Contracts and doubly considering Hartford's future performance obligations. *See* FAR § 49.404.

14

The Surety's assignment and subrogation rights "relate back" to the date of the execution of the Bonds, here November 8, 2020. *See Pennsylvania Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 952 (8th Cir. 2004). Thus, Hartford's rights to receive bonded Contract funds predate the bankruptcy petition date of April 22, 2024 by nearly three and half years, and Hartford's objection to the Joint Settlement should be sustained.

3. **The Common Obligee Doctrine Entitles a Surety to Assert Equitable Subrogation Rights to Contract Funds on Other Projects with a Common Owner.**

Since the United States Air Force is the owner and contracting party with the Debtor on all of the Air Force Contracts, Hartford's equitable subrogation rights apply to all of the Air Force Projects bonded by Hartford. Courts across the country recognize that a surety who has suffered a loss on one bonded project for a common owner can assert the project owner's right to use profit from another bonded project to cover its loss on the first project. *See in re Larbar Corp.*, 177 F.3d 439 (6th Cir. 1999) (holding that surety was entitled to bonded contract proceeds based upon its right of equitable subrogation and its right to set-off the net profits gained on bonded projects against the net losses incurred in its completion of others; *Dist. Of Columbia v. Aetna Ins. Co.*, 462 A.2d 428 (D.C. 1983) (holding surety entitled to bonded contact proceeds based upon its right of equitable subrogation and the right to set-off unrelated losses with gains on other bonded projects, which as been generally recognized without reservation); *see also Transamerica Ins. Co. v. US.,* 989 F.2d 1188 (Fed. Cir. 1993) (recognizing surety's right of equitable subrogation gives the surety top priority in bonded contract receivables to setoff losses on another bonded project under the common obligee doctrine, which trumped secured lender's security interest).

Here, the Debtor, as general contractor on all contracts, was required to provide payment

15

and performance bonds through Hartford, and the Air Force was the Owner/Obligee under each contract.[1]  As a performing surety, Hartford will stand in the shoes of the Air Force through its right of equitable subrogation and may exercise the Air Force's set-off rights vis-à-vis the defaulted Debtor, under the Air Force Contracts.  Further, as set forth above, Hartford may stand in the shoes of the laborers and materialmen Hartford has paid (currently at least $830,148.66), who have performed work to benefit the Air Force across numerous projects.

### III.     CONCLUSION

For the reasons set forth above, Hartford is subrogated to and was assigned the Debtor's right to the bonded Contracts and bonded Contract funds; Hartford is subrogated to the rights of the Debtor's subcontractors and suppliers to the bonded Contract funds; and Hartford is subrogated to the Air Force's right to the bonded Contract funds to the extent that the Air Force wishes to maintain its performance bond claim.  Accordingly, Hartford respectfully requests that the Court sustain its objection to the Joint Settlement to the extent that the Joint Settlement would deprive the Surety of at least $587,707.49 in earned bonded Contract funds.

[signature page follows]

---

[1] The Relevant Contract at issue are as follows: FA2543-22-F-0058 (Buckley AFB), FA4659-22-F0059 (Grand Forks AFB), FA4528-21-F-0091 (Minot AFB), FA4528-20-D-004 (Minot AFB), and FA4600-20-F-0192 (Offutt AFB).

Respectfully submitted this 26th day of November, 2024.

        The Hustead Law Firm
        *A Professional Corporation*

        *s/ Connor L. Cantrell*
        Patrick Q. Hustead, Esq.,
        Connor L. Cantrell, Esq.,
        *Attorneys for Hartford*

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 26th day of November, 2024 a true and correct copy of the foregoing **HARTFORD'S OBJECTION TO THE UNITED STATES AIR FORCE'S MOTION TO APPROVE JOINT SETTLEMENT BETWEEN THE UNITED STATES AIR FORCE AND THE TRUSTEE [D.E. 157]** was electronically filed via the Court's CM/ECF system and a true and correct copy of the same was delivered to all counsel of record.

*Original Signature is on File at The Hustead Law Firm, A Professional Corporation*

           *s/ Connor Cantrell*
           Connor L. Cantrell, Esq.

18