# United States Bankruptcy Appellate Panel
## For the Eighth Circuit

_____

No. 24-6008
_____

In re: Pro-Mark Services, Inc.

Debtor

------------------------------

Hartford Accident and Indemnity Company

Creditor - Appellant

v.

Capital Credit Union

Creditor - Appellee
_____

Appeal from United States Bankruptcy Court
for the District of North Dakota
_____

Submitted: August 26, 2025
Filed:  October 20, 2025
_____

Before NORTON, CONSTANTINE, and JONES, Bankruptcy Judges.
_____

JONES, Bankruptcy Judge.

Appellant Hartford Accident and Indemnity Company ("Hartford") appeals the order of the bankruptcy court granting Capital Credit Union ("CCU") relief from stay pursuant to 11 U.S.C. § 362(d)(1) to exercise its right of setoff. For the reasons stated below, we reverse and remand.

## FACTUAL BACKGROUND

Pro-Mark Services, Inc. (the "Debtor") is a general contracting construction company. It obtained payment and performance bonds from Hartford on various construction projects as required by the Miller Act, 40 U.S.C. § 3131 *et seq*. To induce Hartford to underwrite bonds on behalf of the Debtor, the Debtor and other indemnitors entered into a General Indemnity Agreement (the "GIA") with Hartford on July 14, 2020. Pursuant to the provisions of the GIA, the Debtor irrevocably assigned, transferred, and conveyed to Hartford all the Debtor's rights in, arising from, or related to Bonds, as defined in the GIA, whether such Bonds were issued prior to, simultaneously with, or subsequent to the execution of the GIA.

Thereafter, on December 31, 2021, the Debtor entered into two business loan agreements with CCU. The first business loan was in the principal amount of $14,750,000, and the second business loan was in the principal amount of $1,000,000. Both business loans were secured by perfected security interests in most all the Debtor's assets, including deposit accounts. The Debtor maintained two deposit accounts at CCU.

Recognizing the potential for overlapping interests in the Debtor's assets, Hartford and CCU entered into an Intercreditor Collateral Agreement (the "ICA") on July 14, 2022. The stated purpose of the ICA was "[t]o establish the relative priorities of [Hartford] and [CCU] and their respective rights in and to the [Debtor's]

assets and properties." (ICA, Recitals ¶ 8).[1] The ICA provided that its provisions were to have the "sole effect of defining the relative rights of [Hartford] on the one hand and [CCU] on the other." (ICA, Covenants ¶ 7).

Several terms were defined in the ICA and these definitions are important to the issues in this appeal. The ICA defined "Collateral" as "the Bank [CCU] Priority Collateral and the Surety [Hartford] Priority Collateral." (ICA, Covenants ¶ 2). "Bank Priority Collateral" was defined as "all the Bank Collateral other than the Surety Priority Collateral." (ICA, Covenants ¶ 2). "Surety Priority Collateral" was defined as "all Bonded Contracts, Bonded Intangibles, Bonded Receivables including affirmative claims, Bonded Records, Bonded Intellectual Property, Bonded Working Assets and all Proceeds thereof." (ICA, Covenants ¶ 2).

The ICA defined "Proceeds" as meaning "without limitation, whatever is receivable or received when any Collateral or the proceeds are sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary and includes, without limitation, all rights to payment, including returned premiums, with respect to any related insurance, chattel paper, instruments, and documents." (ICA, Covenants ¶ 2). "Lien" was defined in the ICA as "any mortgage, deed to secured debt, deed of trust, lien, pledge, charge, security interest, security title or encumbrance of any kind, whether created by agreement or by the possession of property or conferred by statute or applicable law." (ICA, Covenants ¶ 2).

Pursuant to the ICA, Hartford and CCU agreed that "[r]egardless of the relative times of the attachment or perfection of Liens . . . the Liens of [CCU] in the Bank Priority Collateral shall in all respects be senior and superior to the Liens, if any, of [Hartford] in the Bank Priority Collateral." (ICA, Covenants ¶ 3).

---

[1] The ICA was attached as Exhibit 6 to Hartford's Response to Motion to Lift Stay (Doc. No. 24) before the trial court, which pleading and exhibits were designated of record in this appeal. The ICA was also attached as Exhibit 11 to the Stipulated Statement of Undisputed Material Facts (Doc. No. 72) before the trial court.

Conversely, Hartford and CCU agreed that "[r]egardless of the relative times of the attachment or perfection of Liens . . . the Liens of [Hartford] in the Surety Priority Collateral shall in all respects be senior and superior to the Liens of [CCU] in the Surety Priority Collateral." (ICA, Covenants ¶ 4).

In addition, Hartford and CCU agreed in the ICA that "if any Surety Priority Collateral or Proceeds be received by [CCU] before the Surety Debt[2] is paid in full and all commitments and/or obligations under the Surety Documents are satisfied, [CCU] shall deliver the same to [Hartford] in the form received . . . for application on the Surety Debt." (ICA, Covenants ¶ 4).

The ICA also established the relative priorities of the parties in the distribution of the Collateral providing, in part, that "all proceeds of the Bank Priority Collateral shall be applied first to the Bank Debt, until paid in full, [and] next to the Surety Debt," and, conversely, that "all proceeds of the Surety Priority Collateral shall be applied first to the Surety Debt, until paid in full, [and] next to the Bank Debt." (ICA, Covenants ¶ 10(a)-(b)). This same priority in distributions was to be applied to "Proceeds of the Collateral" that "may include insurance proceeds." (ICA, Covenants ¶ 12). The ICA was to be construed and enforced in accordance with North Dakota law.

On April 22, 2024, the Debtor filed a chapter 7 bankruptcy petition in the District of North Dakota. The Debtor owed CCU more than $12 million on the petition date and the loans were in default. As of May 17, 2024, the Debtor's S-1 account ("Share Account") at CCU held the sum of $2,754,143.98 and its S-12 account ("Business Checking") held the sum of $552,326.16.

Upon being notified of the bankruptcy filing, CCU placed an administrative freeze on the Debtor's deposit accounts. CCU then filed the motion that is the subject of this appeal requesting relief from the automatic stay to allow it to set off

---

[2]"Surety Debt" is defined in the ICA, in part, as "any and all indebtedness, liability and/or obligation (financial or otherwise) of the [Debtor] owed to [Hartford] under the Surety Documents." (ICA, Covenants ¶ 2).

-4-

the $3,306,470.14 held in the Debtor's deposit accounts (the "Motion"). CCU's right of setoff was based on the terms of CCU's business account agreements entered into by the Debtor when it opened the deposit accounts as well as the setoff provisions of the business loan agreements executed by the Debtor in connection with the loans.

Hartford objected to CCU's Motion, claiming an interest in the funds pursuant to the GIA and the ICA. As to the GIA, Hartford argued, *inter alia*, that the plain language of the GIA unequivocally assigned the Debtor's rights related to bonded contracts to Hartford. As to the ICA, Hartford argued that the ICA should govern the respective priorities of Hartford and CCU, among other arguments.

Neither the Debtor nor the chapter 7 trustee on behalf of the estate claimed an interest in the funds, and the parties agreed the debt owed to CCU greatly exceeded the value of collateral securing such debt.

On June 11, 2024, the bankruptcy court held a preliminary hearing on the Motion. Following the preliminary hearing, the bankruptcy court ordered the stay to remain in effect pending the final hearing. The final hearing was held on August 2, 2024. Both parties thoroughly briefed the issues prior to the final hearing. In its supplemental brief, Hartford argued CCU's Motion should be denied because Hartford's rights to the funds were superior to CCU's right of setoff. Hartford also represented to the bankruptcy court that "given the briefing and relevant case law, Hartford believes CCU's [Motion] can be decided by the [bankruptcy] [c]ourt based on the parties' submissions." (Hartford's Suppl. Br. ¶ 29). In addition, prior to the final hearing the parties also filed a stipulated statement of undisputed material facts that included twelve exhibits. No witnesses were called.

At the close of the arguments, the bankruptcy court granted CCU's request to lift the automatic stay to exercise its right of setoff as to the $3,306,470.14 in funds in the deposit accounts. In granting CCU's Motion, the bankruptcy court found that CCU, as the moving party, met its initial burden of proving there was no equity in the collateral and presented a prima facie showing that it was entitled to setoff. The bankruptcy court noted that the only element of setoff at issue was whether CCU

had a right to all the sums of money in the deposit accounts. The bankruptcy court then shifted the burden to Hartford to show that it was entitled to all of the money in the deposit accounts.

The bankruptcy court did not consider the provisions of the ICA to determine whether the funds in the deposit accounts were Surety Priority Collateral or Bank Priority Collateral or how the funds should be distributed pursuant to the terms of the ICA. Instead, the bankruptcy court focused on the GIA between Hartford and the Debtor and the requirements of attachment under the Uniform Commercial Code ("UCC") as adopted in North Dakota to determine Hartford's interest in the funds. The bankruptcy court determined that irrespective of the terms of the ICA, the Debtor did not grant Hartford an interest in the deposited funds, even if the funds were from bonded contracts, because the assignment provision of the GIA did not include the word "proceeds." The bankruptcy court therefore determined that Hartford failed to prove it had a right to proceeds from bonded contracts once deposited in the accounts at CCU and lifted the automatic stay for CCU to "proceed with setoff of that sum of money, which is in excess of $3 million." (Tr. at 79). Because we believe it is the ICA that governs the priority issues between Hartford and CCU, we reverse and remand.

## STANDARD OF REVIEW

This court has jurisdiction to hear appeals from "final judgments, orders, and decrees." 28 U.S.C. § 158(a), (b)(1). An order unreservedly granting or denying relief from the automatic stay is a final, appealable order. *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37–38 (2020).

An order granting relief from the automatic stay is reviewed for an abuse of discretion. A court abuses its discretion if the order is based on "clearly erroneous factual findings or on erroneous legal conclusions." *Gess v. Randolph Brooks Fed. Credit Union (In re Gess)*, 526 B.R. 798, 800 (B.A.P. 8th Cir. 2015). This standard is "nearly indistinguishable" from the clearly erroneous standard. *Id*. (citing *Crossroads Ford, Inc. v. Dealer Comput. Servs., Inc. (In re Crossroads Ford, Inc.)*, 449 B.R. 366, 367 (B.A.P. 8th Cir. 2011)).

A determination of whether a party has a right of setoff is reviewed de novo. *United States v. Gerth*, 991 F.2d 1428, 1430 (8th Cir. 1993) (citing *Mickelson v. Leser (In re Leser)*, 939 F.2d 669, 671 (8th Cir. 1991)).

## DISCUSSION

A motion for relief from stay to exercise a right of setoff is governed by Section 362(d) of the Bankruptcy Code. A party in interest may obtain relief from the automatic stay to exercise its right of setoff for "cause." 11 U.S.C. § 362(d)(1).

The Bankruptcy Code does not define "cause" and courts have found "cause" in a variety of circumstances. Generally, a creditor makes a prima facie showing of "cause" by establishing a right of setoff. *In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark.) (citing *In re Nuclear Imaging Sys., Inc.*, 260 B.R. 724, 730 (Bankr. E.D. Pa. 2000)), *appeal dismissed as moot sub nom. IRS v. Ealy (In re Ealy)*, 396 B.R. 20 (B.A.P. 8th Cir. 2008). Once established, the prima facie showing may be rebutted by the party opposing relief. *Id*. (first citing *In re Firestone*, 179 B.R. 148, 148 (Bankr. D. Neb. 1995); then citing *In re Nuclear Imaging Sys., Inc.*, 260 B.R. at 730; then citing *In re Olson*, 175 B.R. 30, 33 (Bankr. D. Neb. 1994); and then citing *In re Whitaker*, 173 B.R. 359, 362 (Bankr. S.D. Ohio 1994)).

There is no federal right of setoff under the Bankruptcy Code, but Section 553 of the Code generally preserves any right of setoff that otherwise exists. *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995). In order to establish the existence of a right of setoff, the creditor must prove the following elements: (1) a debt exists from the creditor to the debtor that arose prepetition; (2) the creditor has a claim against the debtor which arose prepetition; (3) the debt and the claim are mutual obligations; and (4) the creditor has a right to set off the debt under applicable non-bankruptcy law.[3] *United States v. Krause (In re Krause)*, 261 B.R. 218, 222 (B.A.P. 8th Cir. 2001); *see also In re Sauer*, 223 B.R. 715, 724 (Bankr. D.N.D. 1998). To

---

[3]At the final hearing, Hartford and CCU did not dispute the first three elements of setoff, but they did dispute whether Hartford or CCU had priority to the funds in the Debtor's deposit accounts under North Dakota law.

establish a right of setoff under North Dakota law, the creditor must show "mutuality of the parties, such that 'debts and credits are mutual when they are due to and from same person in same capacity.'" *Collection Ctr., Inc. v. Bydal*, 2011 ND 63, ¶ 44, 795 N.W.2d 667, 680 (quoting 80 C.J.S. *Set-off and Counterclaim* § 66 (2010)).

On appeal, Hartford first argues that a motion for relief from stay is a summary proceeding, and, therefore, the bankruptcy court exceeded its authority in adjudicating the merits of the priority dispute between it and CCU. It further argues the bankruptcy court ruled incorrectly on the merits when it found Hartford did not have an interest in the funds in the deposit accounts. Hartford argues language in both the GIA and ICA give it an interest in the funds superior to CCU's interest.

While determining the extent, validity, or priority of contested claims is generally reserved for adversary proceedings,[4] courts often decide setoff rights in the context of motions to lift stay. *See In re Nuclear Imaging Sys. Inc.*, 260 B.R. at 744–45 (determining priority between government's right of setoff and secured creditor's interest in receivables in the context of a motion for relief from stay); *see also United States v. Cherry St. Partners, L.P. (In re All. Health of Fort Worth, Inc.)*, 240 B.R. 699, 705 (N.D. Tex.) (reversing bankruptcy court and lifting stay on appeal to allow United States to exercise right of setoff over objection from secured creditor), *aff'd sub nom. I.R.S. v. Cherry St. Partners. LP (In re All. Health of Fort Worth, Inc.)*, 200 F.3d 816 (5th Cir. 1999); *In re Metro. Hosp.*, 131 B.R. 283, 291 (E.D. Pa. 1991) (affirming order lifting the automatic stay to allow government to set off funds and finding government's rights in funds were senior to rights of other secured creditors).

Determining contested setoff rights in the context of a motion for relief from stay is particularly appropriate under certain circumstances. Such circumstances include situations where "both parties have fully argued their legal positions concerning setoff, thus evidencing an expectation that a determination on that issue will . . . be made," the evidentiary record is "small and largely uncontested," and the

---

[4]*See Montgomery v. Dennis Joslin Co. II (In re Montgomery)*, 262 B.R. 772, 774 (B.A.P. 8th Cir. 2001) (case did not involve setoff rights).

-8-

opposing party "may not have any other opportunity to challenge the subsequent setoff." *In re Nuclear Imaging Sys. Inc.*, 260 B.R. at 731–32.

Here, CCU sought relief from stay to set off the funds in the Debtor's deposit accounts and another creditor, Hartford, objected, claiming a superior interest in the funds. The exact issue before the bankruptcy court was whether it should lift the stay to allow CCU to exercise its right of setoff. Both CCU and Hartford thoroughly briefed the legal issues of priority to the funds prior to the final hearing on August 2, 2024. Furthermore, Hartford expressly represented to the bankruptcy court that "given the briefing and relevant case law, Hartford believes CCU's [Motion] can be decided by the [bankruptcy] [c]ourt based on the parties' submissions." (Hartford's Suppl. Br. ¶ 29). We believe the record reflects the parties' expectation that the bankruptcy court would determine the issue of priority to the funds during the relief from stay proceeding. Accordingly, we find it was appropriate for the bankruptcy court to determine CCU and Hartford's respective rights to the funds during the hearing on the Motion.

We now turn to Hartford's second argument on appeal. Although the bankruptcy court did not exceed its authority in ruling on the merits of the parties' dispute, we agree with Hartford that the bankruptcy court erred by not analyzing the parties' priority positions pursuant to the terms of the ICA.

In its ruling, the bankruptcy court focused on the provisions of the GIA and the elements of attachment under North Dakota's UCC law to determine whether Hartford had an interest in the funds. While the UCC normally governs secured parties' interests in collateral, the provisions of the UCC "may be varied by agreement." N.D. CENT. CODE § 41-01-16(1) (2007).[5] Parties may agree to "override the provisions of Article 9" of the UCC and "rearrange [their] respective seniority." *Gen. Elec. Cap. Corp. v. Union Planters Bank (In re Mach., Inc.)*, 342 B.R. 790, 796 (Bankr. E.D. Mo. 2006) (citing *Gen. Elec. Cap. Corp. v. Dial Bus.*

---

[5]There are exceptions for, *inter alia*, the "obligations of good faith, diligence, reasonableness, and care," which "may not be disclaimed by agreement." N.D. CENT. CODE § 41-01-16(2) (2007).

-9-

*Forms, Inc. (In re Dial Bus. Forms, Inc.)*, 341 F.3d 738, 743 n.3 (8th Cir. 2003)). An intercreditor agreement between competing creditors can constitute an agreement varying the provisions of the UCC. *See In re Gold Digger Apples, Inc.*, No. 16-01783-FPC7, 2017 WL 508209, at *14 (Bankr. E.D. Wash. Feb. 7, 2017) ("waterfall" provision in intercreditor agreement between bank and growers governed parties' priority in certain proceeds from sale of fruit). Generally, contracting parties may "write the terms of the contract themselves" and "may furnish their own glossary of terms that they have employed." *Roen Land Tr. v. Frederick*, 530 N.W.2d 355, 358 (N.D. 1995). When contracting parties define the terms of their agreement, "courts are not at liberty to disregard these definitions and substitute other meanings." *Id*. (citing 17A C.J.S. *Contracts* § 300 (1963)).

It is not uncommon for parties with potential conflicting interests in the same collateral to enter into separate agreements governing priority. Here, Hartford and CCU did just that. CCU was aware of the GIA and Hartford's position as surety for the Debtor, and Hartford was aware of the Debtor's loans with CCU and CCU's status as a secured creditor. Recognizing the potential for overlapping interests in the Debtor's assets, they entered into the ICA for the purpose of establishing their respective priorities and rights to the Debtor's assets. Hartford and CCU explicitly agreed the ICA would define their rights as between each other. By entering into the ICA, they voluntarily agreed to contract around the provisions of the UCC, as is expressly allowed under North Dakota's UCC law.

Hartford and CCU agreed to certain definitions in the ICA, including the definitions of Surety Priority Collateral, Bank Priority Collateral, and Proceeds. Hartford and CCU agreed that regardless of the times of attachment or perfection, Hartford would hold a superior interest in Surety Priority Collateral and CCU would hold a superior interest in Bank Priority Collateral. The parties further agreed that if CCU received any Surety Priority Collateral or Proceeds, it would deliver the same to Hartford under certain circumstances. The parties also agreed, *inter alia*, on how proceeds from Collateral would be distributed, what constituted ordinary course payments, and priorities regarding certain insurance proceeds.

Hartford and CCU were free to contract with each other to vary the provisions of the UCC and establish their respective rights and priorities in the Debtor's assets, and they did so by entering into the ICA. The terms of the agreement between Hartford and CCU govern the priority of distributions. The bankruptcy court erred in not analyzing the parties' positions pursuant to the terms of the ICA.

## CONCLUSION

The bankruptcy court did not exceed its authority in adjudicating the merits of the dispute between Hartford and CCU concerning the priority of the parties to the funds. However, the bankruptcy court erred in failing to analyze the priority positions of Hartford and CCU pursuant to the terms of the ICA. We therefore reverse and remand this matter for further proceedings consistent with this opinion.

_____