**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In Re:<br><br>Pro-Mark Services, Inc.,<br><br>Debtor. | Case No.: 24-30167<br><br>Chapter 7 |

# PRE-HEARING BRIEF

## INTRODUCTION

Capital Credit Union ("CCU") has moved to lift the automatic stay to set off $3,306,470.14 held in Debtor's two deposit accounts at CCU—the S-1 regular share account and the S-12 business checking account (together, the "Deposit Accounts")—against Debtor's prepetition indebtedness to CCU of $12,205,730.99. The major facts underlying the motion are not seriously in dispute: CCU is the bank that maintains the Deposit Accounts, holds a perfected security interest in them, and holds an undisputed prepetition right of setoff. On that showing CCU has established a prima facie case of "cause" for stay relief, and the burden shifts to any party opposing the motion.

Hartford Accident and Indemnity Company ("Hartford") opposes, asserting that some portion of the funds in the Deposit Accounts consists of proceeds of bonded construction contracts in which it claims a senior interest under the Intercreditor Collateral Agreement. While CCU agreed—through the Intercreditor Collateral Agreement—to subordinate its interests in collateral to Hartford's secured interests in Surety Priority Collateral, to defeat CCU's prima facie "cause" for stay relief, Hartford must carry its burden of tracing identifiable bonded-contract proceeds into the Deposit Accounts. The Court should lift the stay and permit

CCU to set off the Deposit Accounts funds, reserving for the adversary proceeding only any discrete sum Hartford effectively traces.

## FACTUAL BACKGROUND

Debtor executed two loans with CCU: Loan No. 1 in the original principal amount of $14,750,000.00 and Loan No. 2 in the original principal amount of $1,000,000.00, each secured by a Commercial Security Agreement dated December 31, 2021.[1] The Security Agreements granted CCU a security interest in substantially all of Debtor's assets, including "deposit accounts," "accounts," "money," "other rights to payment," and "general intangibles," together with all proceeds, "whether now owned or hereafter acquired."[2] CCU perfected its lien by filing Financing Statement #21-000991648 with the North Dakota Secretary of State on December 31, 2021.[3]

Debtor maintained two deposit accounts at CCU: the S-1 regular savings/share account and the S-12 business checking account.[4] Under the January 12, 2024, Amendment to Modification Agreement, Debtor agreed that CCU would transfer $853,304.64 from the S-12 account to the restricted S-1 account in three installments of $284,434.88 (January 15, February 15, and March 15, 2024), that the S-1 funds would be "held and controlled in the account within the sole discretion of the Credit Union," pledged as additional collateral and

---

1 ECF No. 72, at ¶¶ 4-12.

2 ECF No. 72-2, at 10; ECF No. 72-3, at 10.

3 ECF No. 72-2, at 16.

4 ECF No. 72, at ¶ 14.

subject to setoff, and that Debtor "will not have control over any of the current or future funds deposited in the restricted share account."[5]

Debtor failed to make its April 15, 2024, loan payment and is in default, triggering cross-defaults across both loans. As of the April 22, 2024, petition date, Debtor owed CCU $11,374,230.01 on Loan No. 1 and $831,500.98 on Loan No. 2—a total of $12,205,730.99.[6] As of May 17, 2024, S-1 held $2,754,143.98 and S-12 held $552,326.16, for a combined $3,306,470.14.[7]

The Business Loan Agreements, the Promissory Notes, the Security Agreements, and the CCU Account Agreement each grant CCU a statutory lien on, and a right to apply, "all shares and deposits" in Debtor's accounts "regardless of their source" upon default.[8]

Hartford, the surety on certain of Debtor's bonded federal contracts, asserts an interest in bonded-contract proceeds that were deposited into the Deposit Accounts.[9]

## Law and Argument

### I. CCU holds a perfected security interest in the Deposit Accounts.

A security interest in a deposit account "may be perfected only by control[.]"[10] A secured party "has control of a deposit account . . . if . . . [t]he secured party is the bank with which the deposit account . . . is maintained[.]"[11] Control by the maintaining institution is

5 ECF No. 72-3, at 19-20.

6 ECF No. 72, at ¶ 24.

7 *Id.* at ¶ 20.

8 ECF No. 72-2, at 4, 9, 10; ECF No. 72-3, at 4, 9, 10.

9 *See generally* ECF No. 24.

10 N.D.C.C. § 41-09-32(2)(a).

11 N.D.C.C. § 41-09-04(1)(a).

automatic—it requires no control agreement and persists "even if the debtor retains the right to direct the disposition of funds[.]"[12] Perfection by control attaches "not earlier than the time the secured party obtains control and remains perfected by control only while the secured party retains control."[13]

CCU maintains the S-1 and S-12 accounts, thereby holding a perfected, controlling security interest in the Deposit Accounts.[14] That interest "has priority over a conflicting security interest held by another secured party," subject only to a carve-out (a secured party that became the bank's own customer on the account) inapplicable to this case.[15]

## II. CCU holds a prepetition right of setoff under nonbankruptcy law.

Section 553(a) of the Bankruptcy Code preserves a creditor's right "to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case[.]"[16] Setoff prevents "'the absurdity of making A pay B when B owes A.'"[17] While Section 553 creates no federal right of setoff, it specifically preserves whatever right exists under applicable nonbankruptcy law upon a showing that (1) the creditor owe a prepetition debt to the debtor, (2) the creditor hold a prepetition claim against the debtor, (3) the debt and claim be mutual, and (4) the creditor hold a right of setoff under nonbankruptcy law.[18]

---

[12] N.D.C.C. § 41-09-04(2).

[13] N.D.C.C. § 41-09-34(2).

[14] N.D.C.C. § 41-09-32(2)(a); N.D.C.C. § 41-09-34(2).

[15] N.D.C.C. § 41-09-47(3).

[16] 11 U.S.C. § 553.

[17] *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (citation omitted).

[18] *In re Pro-Mark Servs., Inc.*, 673 B.R. 565, 571 (B.A.P. 8th Cir. 2025).

CCU satisfies each element. CCU owes Debtor a prepetition debt—the funds on deposit in the Deposit Accounts. CCU holds a prepetition claim—the $12,205,730.99 indebtedness in default as of the Petition Date. The obligations are mutual, running between CCU and Debtor in the same capacity. And CCU holds a right of setoff under both North Dakota law and the express terms of the loan documents and account agreement.

## III. CCU's prima facie showing of cause shifts the burden to Hartford.

On request of a party in interest, the Court "shall grant relief from the stay . . . for cause[.]"[19] A "creditor makes a prima facie showing of 'cause' by establishing a right of setoff," and "[o]nce established, the prima facie showing may be rebutted by the party opposing relief."[20]

This Court has already applied this framework in this case during the August 2, 2024, hearing on CCU's Motion—finding that CCU met its initial burden and made a prima facie showing of entitlement to setoff, that the only disputed element was whether CCU had a right to all of the funds, and then "shift[ing] the burden to Hartford to show that it was entitled to" the money.[21] On remand, that same framework controls, and with CCU having made its prima facie showing, the burden rests on Hartford.

## IV. To subordinate CCU's perfected interest, Hartford must successfully trace identifiable bonded proceeds.

A security interest continues in "identifiable proceeds . . . only . . . to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable

---

19 11 U.S.C. § 362(d)(1).

20 *In re Pro-Mark Servs.*, 673 B.R. at 571 (citations omitted).

21 *Id.* at 570.

principles," permitted under other law.[22] The party claiming an interest in commingled funds—here Hartford—bears the burden of tracing.[23] In other words, the burden having shifted to Hartford, to defeat CCU's claim for a setoff, Hartford must trace any funds in which it claims an interest.

In the Eighth Circuit, the method for tracing comingled funds is the lowest intermediate balance rule whereby traced proceeds are treated as the last funds withdrawn, but once withdrawn they are "treated as lost, even though subsequent deposits are made into the account."[24] It is not enough to show that bonded proceeds were deposited "at some point"; a claimant must show an identifiable interest that survived any intervening withdrawals,[25] and commingled funds "must be positively identified, or else the reclaiming party is relegated to the status of a general unsecured creditor, regardless of the equities."[26]

**V. A floating lien does not relieve Hartford of the tracing burden or shift it to CCU.**

Any potential floating-lien does not relieve Hartford of its tracing burden. In the related adversary litigation, this Court has held that the General Indemnity Agreement's grant of a security interest in "accounts" and "accounts receivable" presumptively reaches after-acquired bonded receivables.[27] Even assuming that the Court will reach the same conclusion with

---

22 N.D.C.C. § 41-09-35(2)(b).

23 *Gen. Elec. Cap. Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049, 1055 (8th Cir. 2005).

24 *Meyer v. Norwest Bank Iowa, Nat. Ass'n*, 112 F.3d 946, 951 (8th Cir. 1997) (citation omitted).

25 *Id.* at 950.

26 *In re Graphics Tech., Inc.*, 306 B.R. 630, 635 (B.A.P. 8th Cir. 2004) (citation omitted).

27 *See Capital Credit Union v. Pro-Mark Servs., Inc.*, Adver. No. 25-7001, ECF No. 75, at 39-42.

respect to the Motion,[28] a floating lien would concern the attachment of a security interest in bonded receivables, and would not—by itself—identify any funds as the proceeds of any such floating lien. A lien on the proceeds of bonded receivables, like any interest in proceeds, continues only in identifiable proceeds.[29] A floating lien that attaches to a revolving pool of receivables does not, by that attachment, identify which dollars in a commingled deposit account are the proceeds of those receivables. That separate identification must be accomplished by tracing through the lowest intermediate balance rule, with the burden firmly remaining with the claimant.[30] Accordingly, application of a floating-lien theory identifies what Hartford must trace (after-acquired bonded receivables), but does not relieve Hartford of its tracing burden.

## VI. Any lowest intermediate balance rule tracing must be conducted on a pro rata basis because CCU and Hartford are competing good-faith creditors.

Even if Hartford could trace identifiable bonded proceeds into the Deposit Accounts, the lowest intermediate balance rule should not be applied in a one-sided, Hartford-favorable manner. The presumption at the heart of the lowest intermediate balance rule—that an account holder is deemed to withdraw its own, non-proceeds funds first, leaving the claimant's

---

[28] In the related adversary litigation, CCU objected to the imposition of a floating lien in favor of Hartford with respect to post-GIA bonded contract receivables. *See generally Capital Credit Union v. Pro-Mark Servs., Inc.*, Adver. No. 25-7001, ECF No. 74. With the Court having already overruled such objections, but being cognizant of the need to preserve the issue with respect to the Motion, CCU seeks to oppose the application of a "floating lien" in favor of Hartford over after-acquired bonded contracts receivables and proceeds for the reasons stated in its Plaintiff's Objection to the Provisional Memorandum and Order's Adoption of a Floating Lien under the General Indemnity Agreement. *See generally id.* If the Court will not permit CCU to preserve its objections by reference, CCU will advance such arguments during any argument afforded on CCU's pending Motion during the October 16, 2026 hearing.

[29] N.D.C.C. § 41-09-35(2)(b).

[30] *Gen. Elec. Cap. Corp.*, 409 F.3d at 1055, 1059-60.

proceeds intact as long as a balance remains—is an equitable device developed to divide a commingled fund between an innocent claimant and the wrongdoer or defaulting fiduciary who did the commingling.[31] It "may not be used to create priorities between restitution claimants whose interests in commingled assets are otherwise indistinguishable."[32] Where multiple good-faith claimants trace to the same commingled account, they should "share the traced funds pro rata," with that same equitable principle rebutting "the assumption that the debtor spends its own money first."[33] Accordingly, where the lowest intermediate balance is insufficient to satisfy competing claimants, the balance is distributed pro rata.[34]

Those principles govern this dispute because both CCU and Hartford are good-faith creditors. CCU is a perfected, secured lender that advanced more than $15 million to Debtor, and holds a controlling, statutorily senior, interest in the Deposit Accounts. Hartford is an innocent surety asserting a competing claim to bonded proceeds. Neither is the wrongdoer whose conduct the "own-money-first" presumption was designed to address. Applying the presumption to charge every dissipating withdrawal from the commingled S-12 operating account against CCU's collateral, while preserving Hartford's bonded proceeds in full, would do precisely what *Cunningham* and the Restatement caution against: use an equitable fiction

---

31 *See* Restatement (Third) of Restitution and Unjust Enrichment § 59, cmt. (d) (2011).

32 *Id.* at cmt. (g).

33 *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 308 (7th Cir. 2014); *see also Cunningham v. Brown*, 265 U.S. 1, 12-13 (1924) (even innocent claimants must trace, and among similarly situated claimants the equities of restitution favor ratable distribution).

34 *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1064 (3d Cir. 1993).

meant for a claimant-versus-wrongdoer contest to manufacture a priority for one innocent claimant over another.[35]

Here, Debtor ran the S-12 account as a high-velocity general operating account in which bonded deposits were a small fraction of total inflows and were continually paid out alongside far larger nonbonded deposits.[36] Under a pro rata application, each withdrawal would be treated as consuming bonded and nonbonded funds in proportion to their share of the balance at the time. If Hartford can identify deposits into the Deposit Accounts as the proceeds from bonded contracts, then the Court should hold that any bonded proceeds Hartford succeeds in tracing are limited to their pro rata share of the lowest intermediate balance.

## VII. The Court should lift the stay and permit setoff, reserving only any sum Hartford actually traces.

Unless Hartford can carry its burden to trace any particular funds, the Court should grant relief from the stay and permit CCU to set off the funds in the Deposit Accounts.[37] To the extent the Court wishes to protect any bonded-proceeds interest Hartford may ultimately establish, Section 362(d) authorizes the Court to condition relief rather than deny it—for example, by permitting immediate setoff of all funds other than a discrete amount Hartford traces by a recognized method, limited to that amount's pro rata share of the account balance,

---

35 *In re Mississippi Valley Livestock*, 745 F.3d at 308 ("Between claimants similarly situated, the equities of restitution (like the equities of bankruptcy) favor ratable distribution." (citation omitted)); Restatement (Third) of Restitution and Unjust Enrichment § 59, cmt. (g) (LIBR tracing "may not be used to create priorities between restitution claimants whose interests in commingled assets are otherwise indistinguishable").

36 *Capital Credit Union v. Pro-Mark Servs., Inc.*, Adver. No. 25-7001, ECF No. 72, at 32 & 39.

37 *See* 11 U.S.C. § 362(d)(1) (allowing relief from stay "for cause").

with the reserved sum held pending resolution of the adversary proceeding.[38] That approach honors CCU's perfected priority, places the tracing burden where it belongs, confines any surviving surety interest to its equitable pro rata share, and avoids indefinitely depriving CCU of funds in which it holds a senior, controlling interest.

## CONCLUSION

For the foregoing reasons, CCU respectfully requests that the Court enter an order (i) granting CCU relief from the automatic stay under 11 U.S.C. §§ 362(d)(1) and 553(a) and Bankruptcy Rule 4001(a) to set off the $3,306,470.14 held in the Deposit Accounts against the Indebtedness; (ii) in the alternative, conditioning relief so as to permit immediate setoff of all funds other than any discrete sum Hartford identifies through a recognized tracing method—and, as to any such sum, limited to its pro rata share of the lowest intermediate balance—with any reserved sum preserved pending resolution of Adversary No. 25-07001; and (iii) granting such other and further relief as is just and proper.

Dated this 14th day of October, 2026.

**VOGEL LAW FIRM**

BY: *\/s/ Drew J. Hushka*
Caren W. Stanley (#06100)
cstanley@vogellaw.com
Drew J. Hushka (#08230)
dhushka@vogellaw.com
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
Telephone: 701.237.6983
*ATTORNEYS FOR CAPITAL CREDIT UNION*

---

38 *See* 11 U.S.C. § 362(d).