**EXHIBIT 1**

# INTERCREDITOR COLLATERAL AGREEMENT

This Intercreditor Collateral Agreement is made as of July, 14th, 2022 by and among Hartford ("Hartford" or the "Surety"), and Capital Credit Union ("Bank").

## RECITALS

1. Pro-Mark Services, Inc., a North Dakota corporation (hereinafter referred to as the "Principal"), is engaged in the business of construction.

The Principal and others executed General Indemnity Agreements in favor of Hartford, two dated July 14, 2020 and one dated July 8, 2022 (the General Indemnity Agreements are collectively referred to as the "GIA" herein).

2. In partial consideration for the promises made by the Principal (as such term is defined below) in the GIA (as more fully defined below, the "Surety Documents"), the Surety has issued certain Bonds and/or may in the future issue certain Bonds on behalf of the Principal.

3. As a condition precedent to and in consideration for the Surety issuing such Bonds, the Principal assigned to the Surety its right, title and interest in certain of its assets, as more fully described in the Surety Documents.

4. The Principal and the Bank entered into a Business Loan Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "Bank Loan Agreement") dated December 31, 2021, pursuant to which, among other things, the Bank provided a loan for the benefit of the Principal.

5. As a condition precedent to and in consideration for the Bank's agreement to make the loan and other financial accommodations under the Bank Loan Agreement, the Principal granted the Bank a security interest in and to substantially all of its assets under the Bank Loan Agreement pursuant to the terms of a Commercial Security Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "Bank Security Agreement"; the Bank Loan Agreement and the Bank Security Agreement, collectively, the "Bank Agreement") dated December 31, 2021.

6. The Principal's execution and delivery of the Bank Security Agreement was a condition precedent to and in consideration for the Bank's agreement to make loans and other financial accommodations under the Bank Loan Agreement.

7. The Surety's rights to the Principal's assets include equitable subrogation and setoff rights that may be, in certain cases and subject to the terms hereof, superior and prior to the security interests and liens granted to Bank under the Bank Security Agreement.

8. To establish the relative priorities of the Surety and the Bank and their respective rights in and to the Principal's assets and properties, the Bank and the Surety enter into this Agreement.

## COVENANTS

1. **Incorporation.** The above Recitals are contractual and incorporated into these Covenants.

2. **Definitions.** As used in this Agreement, the following terms have the following meanings which definitions shall be equally applicable to both the singular and plural forms of such terms:

"Agreement" means this Agreement, as may be amended from time to time.

"Bank" has the meaning set forth in the preamble of this Agreement.

"Bank Agreement" has the meaning set forth in the Recitals.

"Bank Collateral" means any and all property of the Principal in which the Bank holds a Lien to secure any of the Bank Debt.

"Bank Debt" means any and all indebtedness, liabilities and obligations (financial or otherwise) of any kind or character of the Principal to the Bank under the Bank Documents or otherwise, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including all interest accruing after the commencement of insolvency or bankruptcy proceedings, and all indebtedness, liabilities and obligations incurred in the refinancing or extension of any or all of such Bank Debt from time to time.

"Bank Documents" means (a) the Bank Agreement and each other agreement, document and instrument executed in connection with it and (b) each other agreement, instrument, or document pursuant to which the Bank has agreed to make extensions of credit or other financial accommodations to the Principal or which evidences any debt or other obligation payable or owed by the Principal to the Bank, in each case as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Bank Event of Default" means any "Event of Default" as such term is defined and used in the Bank Agreement.

"Bank Intellectual Property" means all the Intellectual Property other than the Bonded Intellectual Property.

"Bank Loan Agreement" has the meaning set forth in the Recitals.

"Bank Priority Collateral" means all the Bank Collateral other than the Surety Priority Collateral.

"Bank Records" means all Records other than the Bonded Records.

"Bank Security Agreement" has the meaning set forth in the Recitals.

"Bond" means any and all bonds, undertakings, guarantees, commitments, obligations of suretyship and like instruments Underwritten by Hartford or others, including all riders, renewals, continuations, endorsements, changes or modification on behalf of or at the request of Indemnitors or for which Hartford has an obligation pursuant to a merger, acquisition, asset purchase or similar transaction. For the purposes of this definition, in the event Hartford or its authorized agent issues a prequalification or bondability letter or any similar expression of opinion ("Prequalification Letter") on behalf of or at the request of any Indemnitor, said Prequalification Letter shall fall within this Agreement's definition of "Bond".

"Bonded Contract" means any contract referred to or described in any Bond issued on behalf of the Principal.

"Bonded Intangibles" means without limitation, all rights, actions, causes of action, claims and demands of the Principal in, or arising from or out of: (i) any Bonded Contract including any extensions, modifications, changes and/or alterations; or (ii) any subcontract or purchase order in connection with a Bonded Contract or against any subcontractor or any Person, furnishing or agreeing to furnish or supply labor, materials, supplies, machinery, tools, or other equipment in connection with or on account of a Bonded Contract or against any surety or sureties of any such materialman, subcontractor, laborer or other Person; or (iii) any and all payments under insurance (whether or not Surety is the loss payee), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to Surety Priority Collateral.

"Bonded Intellectual Property" means all the Intellectual Property relating to a Bonded Contract, Bonded Working Assets or Bonded Receivables, but only to the extent that such Intellectual Property relates thereto, it being understood that in all other respects the Intellectual Property shall constitute Bank Priority Collateral.

"Bonded Receivable" means all right, title, and interest of the Principal to all moneys due or to become due to the Principal by an Obligee arising directly out of a Bonded Contract including, without limitation, progress payments, deferred payments, affirmative claim payments, payments of retained percentages or any certificates of deposit, escrow accounts, or other instruments of any nature, whether posted in lieu of retention or otherwise by the Principal or other Person for a Bonded Contract.

"Bonded Records" means all Records that at any time evidence or contain information relating to a Bonded Contract, Bonded Working Assets, Bonded Intellectual Property or Bonded Receivables, it being understood that in all other respects the Records shall constitute Bank Priority Collateral.

"Bonded Working Assets" means all inventory, materials and equipment, including machinery, wherever located, which are purchased for, installed in or allocated to any Bonded Contract, whether completed or in the process of construction or manufacture.

"Collateral" means the Bank Priority Collateral and the Surety Priority Collateral.

"Collateral Party" means both the Bank and the Surety.

"Debt" means either the Surety Debt or the Bank Debt.

"General Indemnity Agreement" or "GIA" has the meaning set forth in the Recitals.

"Intellectual Property" means all present and/or subsequently acquired trademarks, trade names, patent applications, patents, copyrights, trade secrets, inventions, designs, franchises, customer lists and any other confidential information relating to the Principal's business or held by the Principal pursuant to licenses, or otherwise, with all of the foregoing including software or computer programs of any nature.

"Lien" means any mortgage, deed to secure debt, deed of trust, lien, pledge, charge, security interest, security title or encumbrance of any kind, whether created by agreement or by the possession of property or conferred by statute or applicable law.

"Obligee" means any named party or parties appearing on the Bond(s) in whose favor the Bond(s) are issued, or such parties' permitted assignees.

"Ordinary Course Payments" means the payment, prepayment, or repayment of principal and other obligations with respect to the Bank Loan Agreement and the other Bank Documents (regardless of whether the same are made with Surety Priority Collateral or the proceeds thereof), other than (a) payments, prepayments, or repayments made upon or in connection with any acceleration of the Bank Debt pursuant to any exercise of remedies by Bank upon the occurrence of a Bank Event of Default and (b) payments, prepayments, or repayment of principal and other obligations with any Surety Priority Collateral or the proceeds thereof during any Surety Event of Default Period. For the avoidance of doubt, all insurance and condemnation proceeds received by Bank in accordance with Section 13.a., below, shall be deemed, to the extent applied to the Bank Debt, to be Ordinary Course Payments.

"Person" means any entity, whether an individual, trustee, corporation, partnership, joint stock company, unincorporated organization, business association, firm, joint venture, government or government agency, instrumentality or political subdivision.

"Principal" has the meaning given such term in the Recitals.

"Proceeds" means, without limitation, whatever is receivable or received when any Collateral or the proceeds are sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary and includes, without limitation, all rights to payment, including returned premiums, with respect to any related insurance, chattel paper, instruments, and documents.

"Records" means all books, records, ledger cards, files, correspondence, computer programs, tapes, software disks and related data processing software (owned by the Principal or in which the Principal has an interest) and at any time evidencing or containing information relating to any of the Collateral.

"Surety" or "Hartford" shall include, individually or collectively, Hartford Fire Insurance Company, Hartford Casualty Insurance Company, Hartford Accident and Indemnity Company, Hartford Underwriters Insurance Company, Twin City Fire Insurance Company, Hartford Insurance Company of Illinois, Hartford Insurance Company of the Midwest, Hartford Insurance Company of the Southeast and any of said companies current or future, direct or indirect insurance company affiliates, subsidiaries, parents, assigns, successors, divisions, co-sureties, reinsurers, or any other person or entity Underwriting any Bond at Hartford's request.

"Surety Debt" means any and all indebtedness, liability and/or obligation (financial or otherwise) of the Principal owed to the Surety under the Surety Documents, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, including all interest accruing after the commencement of insolvency or bankruptcy proceedings with respect to the Principal.

"Surety Documents" means the GIA, together with each agreement, document and instrument related to the GIA.

"Surety Event of Default" means any event of default as defined in the Surety Documents.

"Surety Event of Default Period" means each period:

(a) commencing on the earlier to occur of (i) the date Bank receives written notice from the Surety of the existence of a Surety Event of Default or (ii) the date the Bank accelerates the Bank Debt pursuant to any exercise of remedies by Bank upon the occurrence of a Bank Event of Default; and

(b) ending for any Surety Event of Default Period commencing under the foregoing clause (a)(i), when such Surety Event of Default is cured or waived in accordance with the terms of the Surety Documents.

"Surety Priority Collateral" means all Bonded Contracts, Bonded Intangibles, Bonded Receivables including affirmative claims, Bonded Records, Bonded Intellectual Property, Bonded Working Assets and all Proceeds thereof.

"Underwrite" shall include all manner of underwriting, furnishing, issuing, procuring, analyzing, assuming, executing, considering, renewing, extending, altering, modifying, participating in order continuing any Bond.

Any collectively defined term and any defined term used in the plural shall be taken to encompass all members of the relevant class. Any defined term used in the singular preceded by "any" shall be taken to indicate any number or any one of the members of the relevant class, individually.

3. **Bank Priority Collateral**. Regardless of the relative times of the attachment or perfection of Liens or the order of filing of the security agreements, financing statements, or other documents, the Liens of the Bank in the Bank Priority Collateral shall in all respects be senior and superior to the Liens, if any, of the Surety in the Bank Priority Collateral. Should any Bank Priority Collateral or Proceeds be received by the Surety before the Bank Debt is paid in full and all commitments and/or obligations under the Bank Agreement are satisfied, Surety shall deliver the same to the Bank in the form received (with any endorsement or assignment reasonably requested by the Bank) for application on the Bank Debt. Until delivered, the same shall be held in trust by the Surety as the property of and for the benefit of the Bank. This Section shall not in any way limit the covenants and agreements of the Surety set forth elsewhere in this Agreement.

4. **Surety Priority Collateral**. Regardless of the relative times of the attachment or perfection of Liens or the order of filing of security agreements, financing statements, or other documents, the Liens of Surety in the Surety Priority Collateral shall in all respects be senior and superior to the Liens of the Bank in the Surety Priority Collateral. Subject to the provisions of Section 5.e. and 13.a, if any Surety Priority Collateral or Proceeds be received by the Bank before the Surety Debt is paid in full and all commitments and/or obligations under the Surety Documents are satisfied, the Bank shall deliver the same to the Surety in the form received (with any endorsement or assignment reasonably requested by the Surety) for application on the Surety Debt. Until delivered, the same shall be held in trust by the Bank as the property of and for the benefit of the Surety. This Section shall not in any way limit the covenants and agreements of the Bank set forth elsewhere in this Agreement.

5. **Limit on Security Interests and Right of Action by Surety**. Surety agrees to limit its interests and rights as follows:

a. The Surety represents and warrants that it does not have, and covenants and agrees that, until the Bank Debt is paid in full and all commitments under the Bank Agreement are terminated, it shall not take, a Lien in any of the Bank Priority Collateral.

b. Notwithstanding the foregoing provision, if the Surety at any time has a Lien in any of the Bank Priority Collateral, the Surety agrees that it will not take any action to

foreclose such Lien or take any other action with respect to any Bank Priority Collateral before the Bank Debt is paid in full and all commitments under the Bank Agreement are terminated.

c. The Surety waives any Surety Event of Default resulting solely from the Principal's execution and delivery of, and performance under, the Bank Documents, but only to the extent such Surety Event of Default results from the granting of a Lien in the Bank Collateral, the guarantying of obligations of affiliates contemplated by such Bank Documents, and the incurrence of the Bank Debt.

d. The Surety may (i) foreclose on its security interests in the Surety Priority Collateral in any commercially reasonable manner that the Surety may elect (although such manner shall be in accordance with all applicable law) even though a higher price might have been obtained had such security interests been foreclosed upon in another manner, (ii) apply the proceeds from the Surety Priority Collateral to the satisfaction of Surety Debt, and (iii) otherwise use, assign or consume the Surety Priority Collateral in any manner necessary that Surety, in its commercially reasonable discretion, deems appropriate to fulfill its obligations under the Bonds and to so enforce its rights to the Surety Priority Collateral, all without compensating the Bank.

e. Bank may accept and retain all Ordinary Course Payments.

6. **Limit on Security Interests and Right of Action by Bank**. The Bank agrees to limit its interests and rights as follows (with each such limitation continuing to be effective only until all of the Surety Debt has been paid in full):

a. The Bank agrees that it will not take any action to foreclose or take any other action (other than filings necessary to perfect its Lien) with respect to any Surety Priority Collateral before Surety Debt is paid in full and all commitments under the Surety Documents are satisfied.

b. Notwithstanding any provision in the Bank Documents, (i) the Bank shall not, and shall not require the Principal to, directly or indirectly, instruct the Principal's account debtors obligated with respect to any Bonded Receivable to directly deposit sums due the Principal into any deposit account in which the Bank has a security interest, and (ii) the Bank shall not require the Principal to, directly or indirectly, commingle the proceeds of Bonded Receivables with the Principal's other cash or cash equivalents.

c. The Bank waives any Bank Event of Default resulting solely from the Principal's execution of, delivery of and performance under the Surety Documents to the extent such Bank Event of Default results from the granting of a Lien in the Surety Priority Collateral, the guarantying of obligations of affiliates contemplated by such Surety Documents, and the incurrence of the Surety Debt.

d. Subject to the Surety's right to use equipment for completing the Bonded Contracts as set forth in this paragraph, the Bank may (i) foreclose on the Bank Priority Collateral in any commercially reasonable manner that the Bank may elect

(although such manner shall be in accordance with all applicable law) even though a higher price might have been obtained had such security interests been foreclosed upon in another manner and (ii) apply the proceeds from the Bank Priority Collateral to the satisfaction of the Bank Debt. The Bank may accept and retain all Ordinary Course Payments. Upon the Surety's written request received by the Bank in accordance with this paragraph during a Surety Event of Default Period, the Bank agrees to forbear on selling or otherwise disposing of any equipment which is Bank Priority Collateral (to the extent the Bank has not, before its receipt of such request, taken any binding action with respect to the disposition or liquidation of such Collateral). The Surety shall identify for the Bank which equipment is subject to the Surety's forbearance request in such written request. To the extent permitted under applicable law, the Bank grants to the Surety the right to use from the date of the Surety's notice any equipment so identified directly or through a Contractor. The Surety or the Contractor shall execute a construction industry standard lease with the Bank, with insurance coverage provisions subject to the Bank's approval, which shall not be unreasonably withheld. The Bank shall charge the prevailing market rental rate for such equipment, and Surety shall pay rent for the period commencing from the date it delivered its written notice as provided above until the term of such lease ends in accordance with its terms. The Surety shall pay rent even if the Surety (or any Contractor) does not, in the end, use such equipment.

7. **Effect of Agreement**. The provisions of this Agreement are solely for the purpose and shall have the sole effect of defining the relative rights of the Surety on the one hand and the Bank on the other. This Agreement is not for the benefit of and may not be relied upon or enforced by the Principal or by any other creditor of the Principal. This Agreement shall not impair the obligations of the Principal, which are unconditional and absolute, to pay all Bank Debt and the Surety Debt in accordance with their terms and to comply with all terms of the Bank Documents and the Surety Documents.

8. **No Contest of Liens**. Each Collateral Party agrees that it will not at any time, either directly or indirectly, acting on its own or through another Person, take any action to void or avoid the Lien of the other Collateral Party in any of the Collateral.

9. **Intellectual Property and Records**. Each Collateral Party agrees that, to the extent any Intellectual Property or the Records constitute both Bonded Intellectual Property or Bonded Records, on the one hand, and the Bank Intellectual Property or the Bank Records, on the other hand, such Collateral Party shall cooperate with the other Collateral Party (at such other Collateral Party's expense) with respect to the use of such Intellectual Property or Records in connection with:

a. the Surety's endeavors directly or indirectly through the Principal or otherwise to complete any Bonded Contract or otherwise resolve any claim or liability arising from or related to any Bond; and

b. the Bank's endeavors directly or indirectly through the Principal or otherwise to complete any of the Principal's contracts (other than Bonded Contracts), to resolve

any claim or liability arising from or related to any of the Principal's contracts (other than Bonded Contracts), or to collect the Bank Debt; and

c. the foreclosure, sale or other disposition of such Intellectual Property or related Collateral to enable both Collateral Parties to foreclose upon and sell or otherwise dispose of their related Collateral in a prudent manner, subject to such Intellectual Property or Records being used by the Surety or the Bank as specified in a. and b. above.

10. **Priority on Distribution**. In the event of any distribution, division or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the Collateral, whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of the creditors, or any other similar action or proceeding, or the dissolution or other winding up of the Principal's business, or any other disposition of all or any part of the Collateral:

a. all proceeds of the Bank Priority Collateral shall be applied first to the Bank Debt, until paid in full, next to the Surety Debt (to the extent permitted by applicable law), until paid in full, and then as required by applicable law; and

b. all proceeds of the Surety Priority Collateral shall be applied first to the Surety Debt, until paid in full, next to the Bank Debt (to the extent permitted by applicable law), until paid in full, and then as required by applicable law.

11. **Waiver of Marshaling; Application of Payments, Collections and Proceeds**. Each Collateral Party waives any right to require the other Collateral Party to marshal any security or Collateral or otherwise to compel such other Collateral Party to seek recourse against or satisfaction of the Bank Debt or the Surety Debt, as the case may be, from one source before seeking recourse or satisfaction from another source. Each Collateral Party shall be authorized to apply, reserve and reapply, in whole or in part, any and all payments, collections and proceeds of Collateral received by it to such portion of the Bank Debt or the Surety Debt, as the case may be, as such Collateral Party may lawfully elect consistent with the provisions of the Bank Documents or the Surety Documents, as the case may be.

12. **Insurance**. The Proceeds of the Collateral may include insurance proceeds and the priorities set forth above govern the ultimate disposition of the insurance proceeds. In addition, the Collateral Parties agree that:

a. Except as provided in the following clause 13.b., (i) the Bank shall have the sole and exclusive right, as against the Surety, to adjust the settlement of any condemnation action against any of Collateral and any insurance claims in the event of any covered loss, theft or destruction of any Collateral, (ii) all proceeds of such condemnation or insurance shall inure to the Bank, and (iii) the Surety shall cooperate (if necessary and at Bank's expense) in a reasonable manner in effecting the payment of such condemnation or insurance proceeds to the Bank. The Bank shall have the right (as between the Collateral Parties) to determine whether such proceeds will be applied to the Bank Debt or used to rebuild, replace or repair the affected Collateral. If such proceeds are applied to the Bank Debt, any proceeds remaining after payment

of the Bank Debt and all expenses of collection, including reasonable attorneys' fees and expenses, shall be promptly remitted to the Surety for application to the Surety Debt, or to the Principal, as applicable. It is agreed among the Collateral Parties that the foregoing provisions shall apply with equal force to all casualty and condemnation claims and proceeds respecting Bank Priority Collateral regardless as to whether any Surety Event of Default Period exists.

b. During any Surety Event of Default Period, (i) the Surety shall have the sole and exclusive right, as against the Bank, to adjust the settlement of any condemnation action against any Surety Priority Collateral and any insurance claims in the event of any covered loss, theft or destruction of the Surety Priority Collateral, (ii) all proceeds of such condemnation or insurance shall inure to the Surety, and (iii) the Bank shall cooperate (if necessary and at Surety's expense) in a reasonable manner in effecting the payment of such condemnation or insurance proceeds to the Surety. The Surety shall have the right (as between the Collateral Parties) to determine whether such proceeds will be applied to the Surety Debt or used to rebuild, replace or repair the affected Surety Priority Collateral. If such proceeds are applied to the Surety Debt, any proceeds remaining after payment of the Surety Debt and all expenses of collection, including reasonable attorneys' fees and expenses, shall be promptly remitted to the Bank for application to the Bank Debt, or to the Principal, as applicable.

c. All proceeds of business interruption insurance shall be deemed to be proceeds of the Bank Priority Collateral and shall be dealt with accordingly hereunder.

d. The rights and privileges set forth herein above are not in derogation of any rights which the Principal may have in any of the Surety Documents or Bank Documents as between the Principal and the Bank or Hartford, as applicable.

14. **Notices to the Bank**. The Surety shall give the Bank written notice of the following:

a. The occurrence of a Surety Event of Default with specific description of the Default, if the Surety Debt has been accelerated as a result;

b. The Surety's waiver of any such Surety Event of Default with specific description of the Default but only if that Event of Default would have otherwise been reasonably likely to have resulted in an acceleration of the Surety Debt (as determined by Surety in its reasonable discretion);

c. The proposed sale or other disposition of any Surety Priority Collateral by the Surety other than the sale, disposition or use of Bonded Contract Receivables, Bonded Working Assets, Bonded Intellectual Property and Bonded Intangibles in the usual course of business for completion of the Bonded Contracts; and

d. Upon the Bank's written request, the Surety shall provide the Bank with a list of outstanding Bonded Contracts, including project descriptions.

e. The Principal authorizes the Surety to provide the Bank with a list of outstanding Bonded Contracts, including project descriptions, upon the Bank's written request to the Surety.

15. **Notices to Surety**. The Bank shall give the Surety written notice of the following:

a. The occurrence of any Bank Event of Default with specific description of the Default, if the Bank Debt has been accelerated as a result;

b. The Bank's waiver of any such Bank Event of Default with specific description of the Default, but only if that Event of Default would have otherwise been reasonably likely to have resulted in an acceleration of the Bank Debt (as determined by the Bank in its reasonable discretion); and

c. The proposed sale or other disposition of any Bank Priority Collateral by the Bank as part of the Bank's exercise of its remedies under the Bank Documents, other than the application of accounts receivable and other collections (in each case, constituting Bank Priority Collateral) to the Bank Debt.

d. Upon Surety's written request, the Bank shall provide the Surety with current statements for any loans or depository accounts related to the Principal.

e. The Principal authorizes the Bank to release, furnish and provide the Surety with current statements for any loans or depository accounts related to the Principal at the Bank upon the Surety's written request to the Bank.

16. **Manner of Giving Notice**. Any notices or other communications required or permitted to be given hereunder shall be delivered either: (a) personally, (b) mailed via certified mail return receipt requested, or (c) sent by commercial overnight courier service to the following addresses. Notices shall be deemed to have been given on the day of delivery if delivered personally and on the next business day if mailed via certified mail return receipt request or sent by a commercial overnight courier service.

a. if to the Bank:

Capital Credit Union
Attention: Chief Lending Officer & Legal Department
204 W Thayer Ave.
Bismarck, ND 58501

____________________

b. if to Surety:

Hartford Bond
Attention: Claims Department
One Hartford Plaza, T-12-B
Hartford, CT 06155

____________________

Either party may change the address to whom such notice should be directed by giving written notice in the above-described manner to the other party.

17. **Effect of Failure to Give Notice**. In order to more effectively administer the matters described in this Agreement, the parties have agreed in good faith to give the notices described in this Agreement. However, neither the Surety nor the Bank shall have any liability to any party for any failure to give any notice, and no party shall lose any of its rights because it did not give a notice required under this Agreement; provided, however, that Bank may continue to accept and apply payments as provided in Section 5.e. until such time as the Surety shall have provided the notice referred to therein.

18. **The Bank's Discretion**. The Bank shall have the right, in its sole discretion, to modify, amend, waive, or release any of the terms and provisions of, or their rights under, the Bank Agreement or any other Bank Document, and to exercise or refrain from exercising any powers or rights conferred upon the Bank. Except as otherwise provided in this Agreement, the Surety waives its right to receive from the Bank any notice of any nature whatsoever to which it would otherwise be entitled under applicable law and also waives presentment, demand, and protest with respect to any instrument evidencing the Bank Debt.

19. **Surety's Discretion**. The Surety shall have the right, in its sole discretion, to modify, amend, waive, or release any of the terms and provisions of, or its rights under the Surety Documents, and to exercise or refrain from exercising any powers or rights conferred upon the Surety. Except as otherwise provided in this Agreement the Bank waives its right to receive from the Surety any notice of any nature whatsoever to which it would otherwise be entitled under applicable law and also waives presentment, demand, and protest with respect to any instrument evidencing the Surety Debt.

20. **Relationship of Parties; Additional Agreements**. This Agreement is entered into solely for the purposes provided in it and, except as is expressly provided otherwise, neither Collateral Party assumes any responsibility to the other Collateral Party to advise such other Collateral Party of information known to such Collateral Party regarding the financial condition of the Principal or regarding any of the Collateral, or of any other circumstances bearing upon the risk of nonpayment of the Bank Debt or the Surety Debt. Each Collateral Party shall be responsible for managing its relationship with the Principal and neither Collateral Party shall be deemed the agent or fiduciary of the other Collateral Party for any purpose, except as expressly provided in this Agreement.

21. **Additional Credit Extensions**. The Surety acknowledges, understands and agrees that (a) the Bank may make additional loans and credit extensions available to the Principal from time to time pursuant to the Bank Documents or otherwise, (b) all such additional loans and credit extensions shall constitute part of the Bank Debt and shall be secured by all of the Collateral, and (c) nothing herein shall restrict in any manner or in any way the right of the Bank to make such additional loans and credit extensions available to the Principal as the Bank in its sole and absolute discretion may elect.

22. **Additional Bonds**. The Bank acknowledges, understands and agrees that (a) the Surety may issue additional Bonds for the benefit of the Principal from time to time pursuant to the Surety Documents or otherwise, (b) all such additional Bonds shall constitute part of the Surety Debt and shall be secured by all of the Surety Priority Collateral, and (c) nothing herein

shall restrict in any manner or in any way the right of the Surety to issue additional Bonds for the benefit of the Principal as the Surety in its sole and absolute discretion may elect.

23. **Representations and Warranties**. Each Collateral Party hereby represents and warrants to the other Collateral Party as follows:

a. Each Collateral Party has all requisite power and authority to execute, deliver and perform this Agreement without other or further action or approval of any kind; and

b. This Agreement constitutes the valid and legally binding obligation of such Collateral Party, enforceable in accordance with its terms (except that enforceability may be limited by bankruptcy, insolvency and other laws affecting creditors' rights generally) and no consent or approval of any other party (other than any consent or approval which has been obtained) and no consent, license, approval or authorization of any governmental authority, bureau or agency is required in connection with the execution, delivery, performance, validity and enforceability of this Agreement.

24. **Independent Credit Investigations**. Neither the Collateral Parties nor any of their respective directors, officers, agents, loan participants or employees shall be responsible to the others for the Principal's solvency, financial condition or ability to repay any of the Surety Debt or any of the Bank Debt, or for statements of the Principal, oral or written, or for the validity, sufficiency or enforceability of any of the Bank Documents or the Surety Documents, or the validity or priority of any Liens granted by the Principal to either Collateral Party in connection with any of the Bank Documents or the Surety Documents. Each Collateral Party has entered into its agreements with the Indemnitors based upon its own independent investigation, and makes no warranty or representation to the other Collateral Party nor does it rely upon any representation of the other Collateral Party with respect to matters identified or referred to in this paragraph.

25. **Term**. This Agreement shall remain in effect until the earlier of: (a) the termination of all of the Bank's obligations to extend credit to the Principal under the Bank Agreement and the payment in full of all of the Bank Debt and the termination of all of the Bank's security interests in the Bank Priority Collateral; or (b) the payment in full of all of the Surety Debt, the cancellation or expiration of all Bonds and the termination of all of the Surety's security interests in the Surety Priority Collateral.

26. **Entire Agreement; Merger; Amendments**. This Agreement expresses the entire understanding and agreement of the Collateral Parties and supersedes all prior understandings and agreements of the Collateral Parties regarding the same subject matter. This Agreement constitutes the complete expression of the agreement between the Collateral Parties and is a fully integrated agreement. No prior statements, oral or written, course of dealing or trade usage shall supplement or alter the terms of this Agreement. All discussions and prior agreements are merged herein. This Agreement may not be amended or modified except by a writing signed by the Collateral Parties.

27. **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision

of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

28. **Miscellaneous**. This Agreement shall benefit and bind the parties and their respective successors and assigns. This Agreement may be independently executed in any number of counterparts. Each of these counterparts, when executed and delivered, shall be deemed an original with all counterparts constituting but one instrument. The execution of this Agreement by any party shall not be effective until counterparts have been executed by all parties. Facsimile signatures shall bind the parties. The headings in this Agreement are solely for ease of reference and shall not alter or otherwise affect the meaning. The words "hereof" and "herein", and words of similar import, when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

29. **Governing Law; Consent to Jurisdiction: Waiver of Jury Trial**. **THIS AGREEMENT IS A CONTRACT UNDER THE LAWS OF THE STATE OF NORTH DAKOTA FOR ALL PURPOSES INCLUDING THE PARTIES PERFORMANCE AND ENFORCEMENT THEREOF AND SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF SUCH STATE, WITHOUT REGARD TO THAT STATE'S CONFLICT OF LAW RULES. EACH PARTY (A) CONSENTS TO THE JURISDICTION OF ANY FEDERAL COURT LOCATED WITHIN THE STATE OF NORTH DAKOTA IN CONNECTION WITH ANY ACTION INSTITUTED HEREUNDER; (B) WAIVES ANY OBJECTION TO THE JURISDICTION OR VENUE OF ANY SUCH COURT IN CONNECTION WITH ANY ACTION INSTITUTED HEREUNDER; (C) AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE OF ANY SUCH COURT IN CONNECTION WITH ANY ACTION INSTITUTED HEREUNDER; AND (D) WAIVES ITS RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY SUIT OR ACTION ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.**

[Signatures on following pages.]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Capital Credit Union
("Bank")

By: [signature]

Name: Vance Reinwald

Title: CEO

Hartford
("Surety")

By: [signature]

Name: Dan Dohse

Title: Regional Bond Manager

## ACKNOWLEDGMENT OF PRINCIPAL AND AUTORIZATION TO RELEASE CONFIDENTIAL INFORMATION

The undersigned, as the Principal under the attached Intercreditor Collateral Agreement, dated of even date, between Hartford, and Capital Credit Union (the "Agreement"), hereby acknowledges that it has received a copy of this Agreement and consents to it and agrees to recognize all priorities and other rights granted to the parties under this Agreement. Principal further acknowledges the authorizations provided by Principal under Sections 14(e) and Section 15(e) of this Agreement and authorizes Surety and Bank to release and receive confidential information related to the Principal as detailed under each section.

**Pro-Mark Services, Inc.**

By:______________________________

Name: Chad DuBois______________________

Title: President______________________

ACKNOWLEDGEMENT

STATE OF ______________

COUNTY OF ______________

On this _____ day of July, 2022, before me personally appeared Chad DuBois, known or proven to me to be the President of Pro-Mark Services, Inc. ("Entity") executing the foregoing instrument, and he or she acknowledged said instrument to be the free and voluntary act and deed of Entity for the uses and purposes therein mentioned and on oath stated Entity executed the within instrument pursuant to its by-laws or other constitutional or charter documents and/or a duly adopted resolution of its board of directors or other governing body.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

______________________________
Notary Public (signature)

______________________________
Notary Public (print or type)

Commission expires: